# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0372-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROGER DAVILA-IZAGUIRRE,
a/k/a ROGER A. DAVILA,
ROGER DAVILAIZAGYRRIE,
ROGER A. IZAGUIRRE,
and ROGER DAVILLA-
IZAGUIRRE,

    Defendant-Appellant.

_____

Submitted April 30, 2025 – Decided July 17, 2025

Before Judges Currier and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-03-0145.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Leandra L. Cilindrello, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Roger Davila-Izaguirre appeals from the September 28, 2023 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm.

I.

In 2017, a jury found defendant guilty of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and acquitted him of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(7). He was sentenced to a seven-year term of imprisonment with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2(a). We affirmed the conviction and sentence on appeal. State v. Davila-Izaguirre, No. A-2099-17 (App. Div. June 12, 2020) (slip op. at 26).

We present the pertinent facts from our prior opinion and the record. "To celebrate his wife's birthday, defendant organized an outing for family and friends to go to Yankee Stadium for a concert." Id. at 3. A party bus provided transportation for the group. Id. at 4. Before the bus returned to the stadium to pick up the concertgoers, the driver picked up five additional guests in New

Jersey, including the victim, J.M. (Julie).[1]  Ibid.  "Julie's husband, a police officer, did not attend the celebration because he was . . . work[ing] that evening."  Ibid.

"After the concert, the party bus drove the group around New York City for several hours."  Ibid.  The group was drinking alcohol; Julie testified she was drinking vodka and orange juice, and cognac.  Ibid.

"At approximately 4:00 a.m., the bus returned to defendant's home, where the party continued[, although] no additional alcoholic beverages were provided at the house."  Id. at 5.  "Julie testified she 'was already . . . spinning' [when] they reached the house."  Ibid.  Although she texted her husband to let him know she made it "home," "[s]he testified to having difficulty texting . . . as her vision remained impaired from the alcohol she consumed."  Ibid.

At defendant's home, "Julie 'took a hit of marijuana' and 'started to get even . . . dizzier,' until she fell on the floor."  Ibid.  "After gathering herself, Julie went to the bathroom to 'throw water in [her] face' and 'sober up[]' by making herself vomit."  Ibid.  "She then went into the T.V. room and sat down on the couch."  Ibid.  Julie testified she had never used marijuana before.

---

[1]  Because of the sexual nature of the crimes, we use initials and a pseudonym to protect the privacy of the victim.  R. 1:38-3(c)(12).

A-0372-23

"[T]he last partygoer left around 6:00 a.m." Ibid. When defendant and his wife found Julie sitting on the couch, they decided to let her sleep there. Ibid. "Defendant's wife testified she asked Julie if she felt alright, and Julie responded she was 'fine.'" Ibid. "Defendant and his wife then gave Julie a blanket, closed the door, and left the room." Ibid.

"According to Julie, she fell asleep on the couch fully clothed, wearing a top, pants[,] and flip-flops." Ibid. "While asleep, she felt herself 'turn over . . . in slow motion,' but the room remained quiet." Id. at 5-6. "She next felt her legs 'go up' and her 'clothes . . . sliding off[.]'" Id. at 6. Julie did not react or resist, explaining,

> [t]he room was quiet. I had gone to sleep. So, I thought I was dreaming that . . . . I'm feeling things . . . that my body, that I'm moving. There was nothing like—it was quiet, the room was quiet, so I didn't know that something was happening to me.
>
> [Ibid.]

Julie stated she "recalled feeling pain in her rectum, 'coming and going,' and hearing defendant's voice whispering, '[Y]eah, yeah, yeah, just like that. Just like you wanted it.'" Ibid. "She then described feeling 'like [she] had wet [herself].'" Ibid.

A-0372-23

"Once she woke up, Julie went to the bathroom." Ibid. After touching herself in her rectum area, she noticed blood on her hand and that she was only wearing her top. Ibid. Julie said she panicked and "tried calling several [members of the party group] around 7:00 a.m.; however, [her] calls went unanswered." Ibid. "Julie next called her aunt and told her she believed defendant had raped her." Ibid. She then called another party attendee, stating that defendant raped her. Ibid. That individual came to defendant's house and took Julie to a local hospital. Ibid.

An examination at the hospital revealed Julie had four small abrasions around the anus, a bruise on the interior part of her left lower leg, and further bruising on her right and left arms. Id. at 7. The nurse testified the abrasions were likely "caused by friction" or "pressure and movement over that area." Ibid. DNA testing determined "defendant was the source of the DNA found on Julie's underwear but excluded defendant as a possible contributor to the DNA collected from the swab of the cervix." Ibid.

After defendant was arrested, he waived his Miranda[2] rights and gave two video-recorded statements to police. Id. at 8. During the second interview, "[d]efendant . . . recounted that after he and his wife left Julie on the couch, they

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

went upstairs to their bedroom and had sex." Id. at 9. "Afterwards, defendant went downstairs nude to get water." Ibid. "Defendant explained Julie woke up and confronted him[;] [she was] naked from the waist down." Ibid. Defendant stated Julie "called him 'Gitch'[3] and told him 'come here, come here.'" Ibid. "Defendant tried identifying himself and brought Julie back to the couch." Ibid. According to defendant, Julie then "'got on top of [him]' and 'started riding [him]' until defendant quickly removed her because he was 'shocked.'" Ibid. "Julie said 'this is how I'm going to do it to you, Gitch. This is what I want to do with you, Gitch.'" Ibid. Defendant testified similarly during trial. Id. at 13-14.

Defendant's wife also testified. She said "that after Julie laid down on the couch, she and her husband went upstairs, where they had sex." Id. at 13. "She recounted that defendant then went downstairs to get water and returned in less than four minutes."

During cross-examination, defendant's wife "acknowledged she told police that she and defendant went upstairs and went to sleep." Ibid. "In addition, she told the police that defendant was with her in the bedroom the whole time and that he fell asleep before she did." Ibid. During the trial, the

_____

[3] Julie stated at trial that Gitch was one of defendant's friends. She gave him a lap dance on the bus while the group was driving around.

court did not permit defendant's wife to testify regarding past conversations she had with Julie in which Julie admitted to previous extra-marital affairs.  Id. at 11-12.  However, the judge allowed defendant's wife to testify that Julie told her if she had an affair, it would be via anal sex.  Id. at 12-13.

In defendant's PCR petition, he asserted, among other arguments, that trial counsel should have challenged Julie's testimony that she had never smoked marijuana prior to the evening of these events.  Defendant proffered several witnesses who would have testified about Julie's prior use of marijuana.  Defendant contends this would have affected the jury's assessment of Julie's credibility.  Defendant also asserted trial counsel failed to adequately prepare his wife for her testimony.

After oral arguments on the petition, the court denied relief and defendant's request for an evidentiary hearing in a September 28, 2023 order.  In its oral decision, the PCR court noted that defense counsel cross-examined Julie and "was quite vigorous about the issue of marijuana and [Julie's] credibility."  The court stated "[trial counsel] decided to challenge [Julie's] credibility in arguments to the jury during his summation.  That . . . is perfectly proper."  The court reasoned counsel made a strategic decision not to further question Julie

A-0372-23

but rather to emphasize during his summation that Julie's testimony was not credible.

The court noted that testimony from additional witnesses stating Julie had previously smoked marijuana would not have changed the outcome of the case. The court stated: "[t]he bottom line [was] whether [Julie] was intoxicated or of lesser mental capacity when this incident happened . . . . The bottom line is she was intoxicated."

The PCR court also rejected defendant's contention that trial counsel did not properly prepare his wife for her trial testimony. The court noted the testimony of defendant and his wife was "pretty much consistent." It stated defendant's wife "was prepped to the point where she said the exact same thing or pretty close to what her husband said."

## II.

On appeal, defendant renews his arguments in the following points:

> POINT I
> DEFENDANT WAS ENTITLED TO AN EVIDENTIARY HEARING WHERE HE ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL IN THE FAILURE OF TRIAL COUNSEL TO CALL THREE WITNESSES WHO COULD HAVE TESTIFIED THAT THE VICTIM LIED IN TESTIFYING THAT SHE HAD SMOKED MARIJUANA FOR THE FIRST TIME ON THE NIGHT OF THE INCIDENT.

A-0372-23

POINT II
DEFENDANT WAS ENTITLED TO AN EVIDENTIARY HEARING WHERE HE ESTABLISHED A PRIMA FACIE CASE OF INEFFECTIVE ASSISTANCE OF COUNSEL IN THE FAILURE OF TRIAL COUNSEL TO MEET WITH AND PREPARE A KEY DEFENSE WITNESS FOR TESTIFYING AT TRIAL.

"[PCR] is New Jersey's analogue to the federal writ of habeas corpus." State v. Pierre, 223 N.J. 560, 576 (2015) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)). PCR provides "a built-in 'safeguard that ensures that a defendant was not unjustly convicted.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).

Our "review is necessarily deferential to a PCR court's factual findings based on its review of live witness testimony." Nash, 212 N.J. at 540. However, a PCR court's interpretation of the law is reviewed de novo. Id. at 540-41.

The standard for determining whether counsel's performance was ineffective was formulated in Strickland v. Washington, 466 U.S. 668 (1984), and adopted by our Supreme Court in State v. Fritz, 105 N.J. 42 (1987). To prevail on an ineffective assistance of counsel claim, defendant must meet the two-prong test establishing: (1) counsel's performance was deficient and they made errors so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment; and (2) the defect in performance

9

prejudiced defendant's right to a fair trial such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 694.

A PCR court should grant an evidentiary hearing if a defendant establishes a prima facie ineffective assistance of counsel claim in support of PCR. Preciose, 129 N.J. at 462. "To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate the reasonable likelihood of succeeding under the [Strickland standard]." Id. at 463. A defendant is not entitled to an evidentiary hearing where there is a failure to satisfy either prong of the Strickland standard. Strickland, 466 U.S. at 700.

To establish a prima facie claim, a defendant must present competent evidence, State v. Jones, 219 N.J. 298, 312 (2014), first establishing facts demonstrating counsel's handling of the matter "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. A defendant must then present evidence establishing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Defendant asserts defense counsel failed to call several witnesses to testify that Julie lied at trial when she stated she had never smoked marijuana prior to

the night of this incident. Defendant offers three witnesses who could have testified that Julie had smoked marijuana before, including his wife. Defendant notes that his wife was called as a witness at trial, but defense counsel did not question her about Julie's prior use of marijuana.

Defendant contends this testimony was crucial because "the guilty verdict was dependent upon the jury's assessment of [Julie's] credibility" and

> [t]he defense theory at trial was that the sexual encounter between . . . defendant and the victim was consensual, and that [these criminal] allegation[s] . . . arose because [Julie] . . . was afraid that her husband would find out about the affair, would leave her, and would take away the children.

As stated, defense counsel extensively cross-examined Julie regarding these events and attacked her credibility regarding her allegations. Counsel then chose to address during his summation Julie's statement that she had never smoked marijuana until this particular night. Counsel argued:

> So, let's talk about the marijuana. Remember how she told you that she had . . . some marijuana on the porch when they returned to the house? And what was so remarkable was that she claimed it was the first time she ever smoked marijuana.
>
> Ladies and gentlemen, is it a coincidence that all of this takes place and that night, without any explanation for the provocation of trying marijuana for the very first time in your life, she says I smoked

11

marijuana but it was the very first time in my life; is that believable?

It's convenient. Oh, it's convenient for [Julie] to say that was the very first time I ever smoked marijuana. It's convenient, just as she's concocting this false accusation that entirely hinges on the degree of her intoxication, she's telling you that for the first time in her life, her entire life, she decided to smoke marijuana.

Ladies and gentlemen, I submit to you that when she testified, it was obvious that she was simply lying. Did she actually have marijuana that morning? Who knows? But it is more than obvious that if she did, it was not the first time she had ever smoked marijuana. She was simply lying. And it was obvious that she was lying.

And more important than the lie about marijuana, is the old saying in the law, false in one; false in all. Basically[,] it means that when a person is willing to lie about one thing, they are willing to lie about other things. It's an important way to assess someone's credibility. Their believability. Their trustworthiness. He who makes small lies to cover bigger lies.

And in this case, her lying about it being the first time she ever smoked marijuana, was designed very specifically and very intentionally, to get you to believe that somehow[,] she had an unusual reaction to the marijuana, her reaction that sedated her more than was actually true.

We are satisfied that counsel's decision to address the issue in his summation was part of his trial strategy and not deficient representation. The

12

record reflects trial counsel extensively prepared for trial, objected to questions on direct examination when appropriate, and made vigorous arguments to the jury during summation. As the PCR court stated, trial counsel presented evidence of a cell phone video, cross-examined law enforcement and lay witnesses, and the victim, and led defendant through his trial testimony. Defendant has not established any deficient performance by counsel in choosing to address the marijuana issue in summation.

Moreover, producing one or more witnesses to testify they had seen Julie smoke marijuana before would not have likely changed the outcome. They simply would have contradicted Julie's testimony. But counsel fervently addressed Julie's lack of credibility during cross-examination and his summation. In addition, the jury was instructed on how to assess witnesses' testimony. We discern no error in the PCR court's determination that defendant did not demonstrate that counsel's failure to call a witness to contradict Julie's testimony regarding her marijuana use would, with a reasonable probability, have changed the outcome of the trial.

We similarly reject defendant's argument that his wife was not properly prepared for her testimony for the cogent reasons expressed by the PCR court in

its oral decision. Defendant's wife testified consistently with defendant's version of the events, demonstrating she was prepared by counsel prior to trial.

As defendant has not established a prima facie case of ineffective assistance of counsel, he was not entitled to an evidentiary hearing.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0372-23